### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JEFFREY HEFFERNAN, | : | Civ. No. 06-3882 (KM) |
| | : | |
| Plaintiff, | : | |
| | : | OPINION |
| v. | : | |
| | : | |
| CITY OF PATERSON, MAYOR | : | |
| JOSE TORRES, POLICE CHIEF | : | |
| JAMES WITTIG, and POLICE | : | |
| DIRECTOR MICHAEL WALKER, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MCNULTY, U.S.D.J.:**

The plaintiff, Jeffrey Heffernan, a veteran police officer in the City of Paterson, was demoted following a report that he had picked up a lawn sign from a campaign worker for a mayoral candidate. Heffernan has made a number of claims, but the one that best fits the evidence is that the Defendants,[1] his employers, believed Heffernan had engaged in political speech or campaigning, when in fact he had not. At least one other Circuit has recognized a First Amendment claim for retaliation based on such a mistaken belief. The United States Court of Appeals for the Third Circuit, however, has rejected that "perceived support" rationale—explicitly as to free speech, and by strong implication as to freedom of association. As to this and related claims, Defendants and Plaintiff have moved for summary judgment. Following what I believe to be the law of this Circuit, I will enter summary judgment in favor of Defendants and against Heffernan.

**FACTUAL BACKGROUND**

The facts are stated briefly here, and developed in greater detail in the discussion of the issues.

The plaintiff, Jeffrey Heffernan, has been an officer in the Paterson Police Department since 1985. In 2005, he became a detective, assigned to the office

---

[1] Plaintiff seems to have agreed to voluntarily dismiss Police Director Michael Walker as a defendant in early 2009. (*See* Final Pretrial Order (ECF No. 53-1) at p. 44). I see no notice or order to that effect, however.

of Police Chief James Wittig. At all relevant times, Defendant Jose Torres was the Mayor of Paterson and Defendant Michael Walker was the Police Director.

On April 13, 2006, Heffernan's mother, who was ill, asked him to bring her a lawn sign supporting the candidacy of Lawrence Spagnola (the former chief of police) for mayor of Paterson. She wanted to place the sign in front of her Paterson home. Heffernan called a campaign representative he knew. That representative suggested that Heffernan contact Spagnola's campaign manager, Councilman Aslon Goow, who was distributing signs around Paterson. Later that day, while off duty, Heffernan and his son drove to a street corner in Paterson to get a large lawn sign from Goow. (Pltf's 56.1 Statement ¶¶ 4, 7, 8; Dfd's Resp. Statement ¶¶ 4, 7, 8; see Pltf's Trial Testimony, Lockman Cert. (ECF No. 190-5) Ex. CC at A488). At the street corner, Heffernan spoke to Goow and obtained the sign for his mother. There is a dispute as to whether there was a gathering of Spagnola supporters at the corner. (Pltf's 56.1 Statement ¶ 10; Dfd's Resp. Statement ¶ 10).

Officer Arsenio Sanchez, a member of defendant Mayor Torres's security detail (Sanchez Trial Testimony, Lockman Cert. Ex. BB at A 276), was on traffic patrol at the time. Sanchez saw Goow, Heffernan, and Heffernan's son at the corner. (Pltf's 56.1 Statement ¶ 11 (citing Sanchez testimony)). There is a record of a cell phone call from Wittig to Sanchez minutes later. Sanchez denied under oath that he spoke with Wittig that day. (Lockman Cert. Ex. BB at A284-285) Wittig, however, testified in his deposition that he spoke to Sanchez, who advised him that "Heffernan was out hanging political signs in the second ward with Councilman Goow." (Wittig Dep. Tr., Afanandor Cert. (ECF No. 196-1) Ex. 5 at 75:18 to 76:21). Heffernan contends that Sanchez and Wittig did indeed speak about him in that call. (Id. at ¶¶ 13-14; Lockman Cert. Ex. BB at A292).

At any rate, word got back to the office. The parties agree that the next day, Lieutenant Patrick Papagni informed Heffernan that he was being transferred out of the Chief's office. After Heffernan picked up his personal belongings, Papagni and Deputy Chief William Fraher told him that he was being demoted to walking patrol because of his political involvement with Spagnola. (Pltf's 56.1 Statement ¶ 34; Dfd's Resp. Statement ¶ 34). Wittig testified that Heffernan "breached his trust" as well as office policy by being "overtly involved in the political campaign." That political involvement, said Wittig, was the cause of his demotion. (Wittig Trial Testimony, Lockman Cert. Ex. DD at A644-646).

Heffernan seemingly did deliver the sign to his mother's home in Paterson. He did not display the sign or post it on his mother's property. (Dep. Testimony of Heffernan, Ex. S to Lockman Cert. (ECF No. 197-4) at A199 at 132:23-133:17).

2

Heffernan was a close friend of Spagnola. (Pltf's 56.1 Statement ¶ 5; Dfd's Resp. Statement ¶ 5). He "supported" Spagnola's candidacy in the sense that he wanted Spagnola to win, (Pltf's Testimony, Lockman Cert. Ex. CC at A486:17-23). Heffernan did not, however, live in Paterson and he was not eligible to vote there. (*Id.*). A campaign representative told Heffernan "it would help them out" if he met Goow at the street corner (*id.* at A488:7). Heffernan also testified that he believed he was associated with people in the campaign. (*Id.* at A637:13-15).

## PROCEDURAL HISTORY

Heffernan filed this action on August 17, 2006. The case was initially assigned to District Judge Peter G. Sheridan. Shortly before trial, the defendants moved for summary judgment on the ground that Heffernan had not engaged in any protected speech. On April 3, 2009, Judge Sheridan denied that motion without the benefit of briefing by Heffernan. (ECF No. 62). In that ruling, Judge Sheridan remarked that Heffernan's claim more closely resembled a freedom-of-association claim (Opinion on the Record, Lockman Cert. Ex. F at A135-137) Defendants, at the outset of trial, expressed some surprise that any freedom-of-association claim was in the case. Trial Transcript, Lockman Cert. Ex. BB at A270-271). Judge Sheridan then clearly ruled that the Final Pretrial Order adequately set forth freedom of association as an issue to be tried, and that it would be tried. (*Id.*). *See also* pp. 14-17, *infra.* Following Judge Sheridan's ruling, the parties tried the case on the issue of whether Heffernan's freedom of association rights had been violated.

At the conclusion of that April 2009 trial, the jury entered a verdict against Mayor Torres and Chief Wittig. The jury found that Torres and Wittig had retaliated against Heffernan for exercising his first amendment right of association. It awarded $37,500 in compensatory damages against Torres, $37,000 against Wittig, and $15,000 in punitive damages against each. (ECF No. 76-77). Judgment was entered accordingly. (ECF No. 78). Heffernan, though victorious, moved for a new trial, arguing, among other things, that the Court erred by not allowing Heffernan to go forward with his freedom-of-*speech* claim. (ECF No. 80). Meanwhile, the Defendants appealed the judgment, arguing, *inter alia,* that Judge Sheridan erred in permitting Heffernan to go forward on a freedom-of-*association* claim. (ECF No. 83).

While post-trial motions were pending, Judge Sheridan became aware of a conflict of interest. Judge Sheridan acknowledged that his earlier work at a law firm created an appearance of impropriety and that "[t]he only recourse is to set aside the verdict, and permit a new trial before a different judge." (ECF No. 108). Judge Sheridan therefore entered an Order granting a new trial. (ECF No. 109-110). The case was then reassigned to District Judge Dennis M. Cavanaugh.

Judge Cavanaugh initially told the parties that he would not consider any dispositive pre-trial motions or permit the parties to re-raise issues previously decided. (ECF No. 143). The parties objected. A few weeks later, Judge Cavanaugh relented in part, and permitted the parties to re-file their earlier motions. (ECF No. 147). Torres and Wittig re-filed their earlier motions for summary judgment. (ECF No. 158, 159, 160). Judge Cavanaugh, unlike Judge Sheridan, granted the motions of Defendants Torres and Wittig for summary judgment. He held that Heffernan did not engage in any protected speech and thus had no cognizable First Amendment freedom-of-speech retaliation claim. (ECF No. 167-168). Judge Cavanaugh's opinion and order, however, did not address Heffernan's freedom-of-association claim, the one on which the jury had previously entered a verdict in Heffernan's favor.

Heffernan appealed. The Third Circuit reversed Judge Cavanaugh's judgment on August 7, 2012. (ECF No. 179). The Court of Appeals ruled that Judge Cavanaugh should have afforded Heffernan an opportunity to file papers in opposition to the renewed summary judgment motions. (*Id.* at 6).[2] The Court of Appeals also ruled that facts adduced at the April 2009 jury trial were relevant to summary judgment and should have been considered. Such evidence, "even [from a trial] involving a later recusal, [] is at least as reliable as other pieces of evidence, such as affidavits, that are routinely considered on summary judgment." (*Id.* at 8). Finally, the Court of Appeals ruled that "the able District Judge erred by failing to address Heffernan's Free Association Claim...before entering judgment in favor of the Defendants." (*Id.* at 9).

The Court of Appeals remanded the case with instructions that the District Court (a) permit the filing of updated motions for summary judgment; (b) permit the filing of opposition and reply briefs; (c) freely consider evidence adduced at the 2009 trial in connection with those motions; and (d) determine whether the freedom of association claim is properly before the district court. (*Id.* at 8-10).

After remand, on May 17, 2013, this case was reassigned to me. (ECF No. 202) In accordance with the Court of Appeals' four-part mandate (*see supra*), (a) Defendants have submitted renewed motions for summary judgment; (b) the Court has accepted opposition and reply papers; (c) those papers have cited, and I have considered, evidence of record from the April

---

[2] Judge Sheridan denied Defendants' earlier summary judgment motions on the brink of trial, without the benefit of opposition briefing from Heffernan. At that time, Heffernan obviously had no cause for complaint. After Judge Sheridan granted a new trial and the case was first reassigned, Judge Cavanaugh permitted the parties to re-file earlier motions, but did not permit any further briefing. That left Heffernan in the posture of not having filed any opposition to Defendants' renewed summary judgment motions. Thus, when Judge Cavanaugh decided Defendants' renewed motions—this time *against* Heffernan—he did so without the benefit of briefing from Heffernan.

2009 trial; and (d) I have permitted Heffernan to assert his claim based on the right to freedom of association under the First Amendment.

Currently before this Court are Defendants' renewed summary judgment motions, now fully briefed by both sides, as well as Plaintiff's motion for partial summary judgment. Heffernan contends that he was demoted in retaliation for his exercise of his First Amendment freedoms of speech and political association. Defendants assert that Heffernan did not speak or express himself at all, so no free speech claim is presented. Defendants add that no freedom of association claim was properly pled or otherwise asserted. In the alternative, however, they argue that any freedom-of-association claim should be dismissed on summary judgment. In addition, Defendants assert that, under Section 1983, the City of Paterson cannot be held vicariously liable for the actions of Wittig and Torres, the individual defendants remaining in this case, and that no evidence at all connects Mayor Torres to Heffernan's demotion. (*See* Dfd's Mot. for Summ. J. (ECF No. 189); Dfd's Opp. to Pltf's Mot. for Summ. J. (ECF No. 196); Dfd's Reply in Further Supp. (ECF No. 201)).

### DISCUSSION

Heffernan argues that he suffered retaliation after exercising two First Amendment freedoms: freedom of association and freedom of speech. Upon review of the entire record, I find that the arguments of Defendants Torres and Wittig are correct under the law of this Circuit. I will enter summary judgment in their favor, and deny Heffernan's motion. That ruling renders moot the issue of whether the City of Paterson or Mayor Torres would have been derivatively liability for those alleged First Amendment violations.

### A. Legal Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.,* 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania,* 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.").

When, as here, the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468-69 (D.N.J. 2002) (citing *Weissman v. U.S.P.S.*, 19 F. Supp. 2d 254 (D.N.J.1998)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (2009); *Williams v. Philadelphia Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir.1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

## B. Freedom of Speech Claim

Heffernan claims that Defendants retaliated against him for engaging in speech protected by the First Amendment, and has moved for entry of partial summary judgment. Defendants have moved for summary judgment dismissing this freedom-of-speech claim. The first issue is whether Heffernan *did* engage in protected speech or expression. The second is whether he nevertheless has a cause of action because Defendants retaliated against him based on their *belief* that he had engaged in protected speech or expression. I also consider whether Heffernan aided and abetted the speech of his mother.

### 1. Actual First Amendment speech

A public employee is protected by the First Amendment if he[3] can show that he suffered an adverse employment decision as a result of speaking on a matter of public concern, and that his First Amendment interest outweighs the government's concern "with the effective and efficient fulfillment of its responsibilities to the public." *Fogarty v. Boles*, 121 F.3d 886, 888 (3d Cir.

---

[3] Heffernan happens to be male. For simplicity, I will use the male pronoun even when, as here, speaking generically.

1997) (citing *Green v. Philadelphia Housing Auth.*, 105 F.3d 882, 885 (3d Cir. 1997)). "This test is based on a series of cases in which the Supreme Court struck a balance between the employee's right to speak and the government-employer's duty to serve the public productively." *Id.* at 888-89 (citing, *inter alia, Rankin v. McPherson*, 483 U.S. 378 (1987)).

The initial question is whether Heffernan engaged in protected speech. "[I]n the absence of protected speech, a public employee may be discharged even if the action is unfair, or the reasons "are alleged to be mistaken or unreasonable." *Id.* at 889 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). In *Fogarty*, for example, the Third Circuit affirmed summary judgment against the plaintiff, a teacher, who lost his job after being accused of contacting a newspaper reporter about harmful pollution emanating from construction at the school. *Id.* at 887, 891. The teacher insisted that the principal's information was false; the teacher never spoke to the newspaper reporter. The teacher sued the principal, but lost on summary judgment. Affirming, the Third Circuit "conclude[d] that the absence of speech—in fact, its explicit disclaimer by plaintiff—is fatal to the plaintiff's claim." *Id.* at 891.

Here, too, Heffernan allegedly suffered an adverse employment action based on speech that, by his own account, did not occur. The alleged speech—political campaigning—would obviously constitute protected speech. But Heffernan has always denied any political link to Spagnola. He has stated repeatedly that he delivered the Spagnola lawn signs, not as a political statement, but as a favor to his ailing mother.

Defendants compare this case to *Lombardi v. Morris County Sheriff's Dep't*, 2007 U.S. Dist. LEXIS 37176 (D.N.J. May 22, 2007) (Debevoise, S.D.J.). There, the plaintiff alleged retaliation motivated by his "support" of a fellow officer in an internal affairs investigation. The plaintiff served as the officer's union representative, and his support consisted of "merely standing by [the officer] and being a witness" to an interview. The plaintiff "did not make any comments during the interview." *Id.* at *17. Quoting *Fogarty's* rule regarding the "absence of speech," Judge Debevoise ruled that the plaintiff had not engaged in protected speech, and therefore had no cause of action. *Id.* at *18-*19.

Heffernan seeks to distinguish his case from *Lombardi*, arguing that his purported speech was political in nature. This argument—that Heffernan engaged in political speech *in fact*—is factually dubious, because it contradicts Heffernan's own testimony.[4] It also bypasses the issue of whether Heffernan

---

[4] I will discuss separately the argument that Heffernan's superiors *perceived* that he had engaged in protected speech. *See* pp. 12-13, *infra*. Heffernan testified that he wanted Spagnola to win out of friendship, but the only actions at issue here—the pick-up and delivery of the yard sign—were carried out as a favor to Heffernan's mother, not to express Heffernan's thoughts or beliefs. *See, e.g.*, pp. 8-12, *infra*.

spoke *at all*, arguing instead that any speech must have been *protected* because Heffernan undertook it in connection with the Spagnola campaign. (Pltf's Br. Opp. Dfd's Mot. for Summ. J. at 22). Heffernan's real stumbling block here—like that of the plaintiff in *Lombardi*—is his failure to express himself. Heffernan concedes that "[he] did not 'speak.'" (*Id.* at 22-24). Even assuming *arguendo* that Heffernan privately held politically-charged feelings in favor of Spagnola's candidacy—and he never makes such a contention—he did not say a word regarding Spagnola.

Actual speech, then, is not the issue. I turn now to the issue of whether Heffernan's alleged conduct nevertheless consisted of political *expression*.

### 2. *Actual First Amendment expressive conduct*

Conceding that he did not speak, Heffernan ascribes expressive meaning to his conduct. He argues that he facilitated expression (his mother's posting of a lawn sign) and thereby disseminated the political message of the Spagnola campaign.

Expressive conduct is accorded the same protection as actual speech. *Virginia v. Black*, 538 U.S. 343, 358 (U.S. 2003). Thus, certain non-verbal acts of communication, if sufficiently expressive or symbolic, will satisfy the speech-in-fact requirement of *Fogarty. Herman v. County of Carbon*, 2008 U.S. Dist. LEXIS 46551, *11-12 (M.D. Pa. June 12, 2008) (harmonizing *Fogarty* and *Black*) (citing *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 158 (3d Cir. 2002)).

"Expressive conduct exists where 'an intent to convey a particularized message was present, and the likelihood was great that the message would be understood by those who viewed it,' *Egolf v. Witmer*, 421 F. Supp. 2d 858, 868 (E.D. Pa. 2006) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). That two-part "particularized message" test has been applied to protect, for example, picketing, armband-wearing, flag-waving and flag-burning. *See Johnson*, 491 U.S. at 404. To put it another, somewhat tautological, way, expressive conduct exists where, "'considering 'the nature of the activity, combined with the factual context and environment in which it was undertaken,' we are led to the conclusion that the 'activity was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 160 (3d Cir. 2002) (quoting *Troster v. Pennsylvania State Department of Corrections*, 65 F.3d 1086, 1090 (3d Cir. 1995)); *see Egolf*, 421 F. Supp. at 868 (citing *Tenafly Eruv*). In *Tenafly Eruv,* the Third Circuit underscored that "this 'is a fact-sensitive, context-dependent inquiry,' and [] the putative speaker bears the burden of proving that his or her conduct is expressive." 309 F.3d at 161 (quoting *Troster*, 65 F.3d at 1090).

Here, nothing in the evidence indicates that Heffernan's conduct—obtaining a lawn sign for his mother—was intended to convey a message. Nor was Heffernan's conduct, viewed in context, imbued with elements of communication. In many cases, this might present a factual issue for trial. Here, however, Heffernan himself has repeatedly, in sworn testimony, couched his own conduct as a simple favor to his mother, devoid of political motivation or communicative content. He delivered the sign to his mother as a convenience; he did not post the sign on her lawn, or display it in any manner.

If there were any message here, it would be a political one. Heffernan, however, has consistently denied having any political purpose. At his deposition, he testified:

> Q. And the first amendment violation that you're particularly relying upon is the right to post a sign of someone that you were supporting for mayor, correct?
>
> A. I wasn't supporting him for mayor.
>
> Q. I apologize. Let me rephrase that. That your mother was supporting for mayor?
>
> A. Yes.
>
> Q. Now, you couldn't vote for Larry Spagnola, could you?
>
> A. No.
>
> Q. Because you weren't a resident of the City of Paterson?
>
> A. Correct.
>
> Q. But you were, in fact, going to post a sign on your mother's lawn?
>
> A. No. I was going to pick it up and bring it to her. I wasn't going to post it. I didn't have tools with me. My older brother can take care of that.

(Dep. Testimony of Heffernan, Ex. S to Lockman Cert. (ECF No. 197-4) at A199 at 132:23-133:17). In the same deposition, he characterized his relationship to Spagnola as personal, not political:

> Q. Other than the incident that you've referenced in your complaint about getting a sign for your mother, did you do anything else to outwardly support Larry Spagnola in his bid for mayor?

9

A. No.

Q. Were you working on his campaign?

A. No.

Q. During the time that he was running for this position, did you have conversations with Larry Spagnola?

A. Absolutely.

Q. How often would you speak to him?

A. I spoke to him once or twice, three times a week.

Q. Is he a close personal friend of yours?

A. Yes, he is.

(*Id.* at A193A at 55:24-56:15).

On direct examination at trial, Heffernan confirmed that his relationship with Spagnola was "personal" in nature. (*Id.* at Ex. CC at A-486:8-19). He conceded that he wanted Spagnola to win. He did not testify, however, that he picked up the sign to express his support for Spagnola, or that his actions were was motivated by any desire to see Spagnola win. Rather, the precipitating event was that his mother had "complain[ed] about a few things, and one of them was that somebody had stolen her Laurence Spagnola sign for mayor off the lawn. It was a small one. She asked me if I could reach out to Mr. Spagnola to see if I can [replace it]." (*Id.* at A-487:15-19).

Later, also on direct examination at trial, Heffernan described his response to the accusation that he was campaigning for Spagnola: Heffernan told a colleague that "I was picking a sign up for my mother, and that's all I was doing." (*Id.* at A496:17-18). And upon being advised of his job transfer, he "said to [Lieutenant Papagni] I wasn't politically involved. I was just picking up a sign for my mom." (*Id.* at A499:25-A500:1). Heffernan again emphasized that he "wasn't involved in the campaign." (*Id.* at A501:11).

On cross-examination at trial, Heffernan again confirmed that he intended nothing political:

Q. You agree that even though this was a very heated campaign, you were not involved in Mr. Spagnola's campaign. Correct?

A. Correct.

Q. You agree that you were not ever hanging signs for the Spagnola campaign. Correct?

A. Correct.

Q. So when Aslon Goow said yesterday that you worked on the Spagnola campaign, that would be incorrect?

A. He didn't say that.

Q. Answer my question. If Aslon Goow had said that at one point in time you worked for the campaign, he would be incorrect. Right?

A. Correct.

Q. Because you have repeatedly indicated in deposition transcripts that you were not involved in Mr. Spagnola's campaign. Right?

A. Correct.

(*Id.* at A592:20-A593:11).

In sum, Heffernan never testified that his conduct was spurred by any political motive or belief. He repeatedly testified that his conduct was devoid of political motivation and unconnected to the Spagnola campaign, in which he never participated. No message was conveyed or intended. I give due weight to Heffernan's assertion that he "supported" Spagnola. I read that as a general expression of friendship or sympathy that must be read in context with Heffernan's deposition testimony that he "wasn't supporting [Spagnola] for mayor." I also note Heffernan's statement that he met Mr. Goow on the Paterson street corner because it would "help" the campaign. I take this to refer to logistics; running this errand would spare a campaign worker from doing so). These two statements, in context, are not sufficient to create an issue of fact. And the evidence does not show that Heffernan's actions were intended to, or did, "convey a particularized message." *See Texas v. Johnson*, 491 U.S. at 404; *Egolf*, 421 F. Supp. 2d at 868. Heffernan has never testified that he expressed, or intended to express, anything. Passively desiring to see a candidate win is not the same as actually expressing support for the candidate or his views.

Moreover, the simple act of transporting, as opposed to posting, a sign does not approach the level of conduct that has been found to be expressive. *See Johnson*, 491 U.S. at 404 (stating that second required showing is that the "likelihood was great that the message would be understood by those who viewed it"). Such conduct was not highly likely to be understood as expressive. Heffernan did not march with the sign or post it anywhere; he loaded it in his

vehicle and delivered it to his mother. His conduct was not akin to, for example, visible picketing, wearing an armband, or burning a flag. *See id.* From a First Amendment standpoint, Heffernan's position was not so different from that of the printer who manufactured the sign, or the trucker who delivered the signs to campaign headquarters.

Finally, it is very clear that the context and circumstances of Heffernan's conduct—spurred by his mother's request and unconnected to any aspect of the campaign, and carried out in a straightforward manner without any displaying of the sign—do not imbue his conduct with communicative quality. *See Tenafly Eruv,* 309 F.3d at 160.

Heffernan's conduct cannot be considered expressive under any of the applicable tests. There is no genuine factual issue for trial as to the expressive nature of these acts.

### 3. *Perceived First Amendment speech or expression*

I address an argument implicit in Heffernan's papers: that there is a viable First Amendment claim when an employer has retaliated against an employee based on the employer's mistaken *belief* that the employee spoke or otherwise expressed himself.

The United States Court of Appeals for the Third Circuit has ruled out such a theory. A "perceived support" theory of recovery "cannot form the basis of a First Amendment retaliation claim." *Ambrose v. Twp. of Robinson,* 303 F.3d 488, 495 (3d Cir. 2002). *See also Fogarty v. Boles,* 121 F.3d 886, 890 (3d Cir. 1997).

In *Ambrose,* the plaintiff, a police officer, was suspended, allegedly in retaliation for First Amendment activities. The plaintiff's primary retaliation claim was based on freedom of speech: plaintiff had allegedly drafted an affidavit in support of a fellow employee's lawsuit against the department. The Court of Appeals found insufficient evidence, however, that the defendant even knew of the affidavit's existence when it suspended the plaintiff.

That brought to the fore the plaintiff's "alternative theory" that the defendant suspended him because it *perceived* that he had expressed himself in support of the other officer. Those allegations were murkier. The plaintiff had allegedly entered a locked area of a municipal building after business hours, and had failed to report his movements on his activity sheets. Plaintiff was accused of going there to photocopy documents in furtherance of his fellow officer's lawsuit. Plaintiff, however, denied this; his explanation was that he had gone there only to copy official forms, because his department's copiers were of poor quality. 303 F.3d at 490-492.

Plaintiff thus asserted that he had been suspended because his employer *incorrectly believed* he was copying papers in support of his co-worker's lawsuit. The Third Circuit rejected that "perceived support" theory. In the Court's view, actual First Amendment expression is a prerequisite for a free-speech retaliation claim; an employer cannot retaliate for protected conduct unless there was protected conduct in the first place. *Id.* at 494-496 ("The problem here, as in *Fogarty,* is that there is no protected conduct.") (citing *Fogarty,* 121 F.3d at 890).[5] Thus the absence of actual, protected First Amendment speech or expression by the plaintiff proved fatal to any First Amendment claim.

What remained, said the Third Circuit, was a claim that the plaintiff was fired arbitrarily or by mistake. Such facts might give rise to an employment-law claim of some kind, but not to a constitutional retaliation claim. As held in *Fogarty, supra,* the court "ha[s] never held that it is a violation of the Constitution for a government employer to discharge an employee based on substantively incorrect information." *See id.* (quoting *Fogarty,* 121 F.3d at 890 (quoting *Waters v. Churchill,* 511 U.S. 661 (1994)).

Under the law of this Circuit, there can be no retaliation claim based on an employer's mere perception that the plaintiff has engaged in protected speech or expression. By his own account, Heffernan did not speak or otherwise express himself in support of Spagnola's campaign; he alleges that Defendants retaliated because the incorrectly *perceived* that he had done so. Under Third Circuit law, there is no such "perceived support" claim.

### 4. Does Heffernan have a claim for aiding and abetting speech?

Heffernan also argues that he is entitled to First Amendment protection for having aided and abetted the protected speech of his mother, who did intend to post the yard sign in support of Spagnola's campaign. (Pltf's Br. Opp. Dfd.'s Mot. for Summ J. at 25-27). The only case cited by Heffernan is from the Seventh Circuit, and there is no indication that the United States Court of Appeals for the Third Circuit would adopt the same rule.

In *Gazarkiewicz v. Town of Kingsford Heights,* 359 F.3d 933 (7th Cir. 2004), the Seventh Circuit, in a footnote, approved a district court's holding that there may be First Amendment protection for a person's participation "as an aider and abetter" of another person's protected speech. *Id.* at 938 n.1.

---

[5] *Fogarty* in turn cited *Barkoo v. Melby,* 901 F.2d 613 (7th Cir. 1990). There, a plaintiff was fired based on her employer's mistaken belief that she was behind certain critical newspaper articles. The Seventh Circuit held that there was "no authority for the proposition that her free speech rights are deprived in violation of § 1983 when the speech at issue admittedly never occurred." *Id.* at 619.

There, plaintiff, a laborer, had been terminated for insubordination after his employer, the town, learned that he assisted in the posting of a flyer criticizing the town's superintendent of utilities and calling for new leadership. *Id.* at 936-37. The flyer, signed 'concerned resident,' was drafted by another resident, typed by plaintiff at the other resident's direction, and then posted in a local grocery store (plaintiff knew this would occur, but did not post it himself). *Id.* The Seventh Circuit agreed with the United States District Court for the Northern District of Indiana that the plaintiff's failure to speak personally did not necessarily bar his claim.

The Seventh Circuit found this case to be "a far cry from" *Fogarty, supra,* because the plaintiff—unlike the plaintiff in *Fogarty,* or Heffernan here—did not deny that he expressed himself. It was critical to the Seventh Circuit that "[plaintiff's] participation was not in the nature of a disinterested typist, but as an aider and abetter." *Id.* at 938 n. 1. As the district court had noted, "Plaintiff, while not composing the flyer, played a significant role in its publication. Further, plaintiff's termination for insubordination was triggered by his involvement with the flyer regardless of whether plaintiff composed the flyer or was merely Reese's instrument in drafting the document." *Gazarkiewicz,* 264 F. Supp. 2d 735, 740-41, 744 (N.D. Ind. 2003). In concluding that this involvement "constitute[d] speech," neither the district court nor the Seventh Circuit cited any controlling prior authority. *See id.*; 359 F.2d at 938 n.1.

Adoption of the rule in *Gazarkiewicz,* which has not been adopted elsewhere, would, at the very least, represent a significant expansion of the Third Circuit rule. To the extent it relied on the fact of termination, irrespective of whether the plaintiff expressed himself at all, it would directly contradict *Ambrose* and *Fogarty.* And whatever the merits of such an expansion, it would not be appropriate on the facts of this case. The evidence here does not suggest that Heffernan played any role in the production of the sign, that he intended to adopt its message as his own, or that he intended to act even as the passive "instrument" of the Spagnola campaign when he delivered the sign to his mother.

The Seventh Circuit itself, analyzing the facts of that case, found it to be a "far cry" from *Fogarty,* and ruled on that basis. I agree. Heffernan's case, in my view, is controlled by *Fogarty* and *Ambrose.* Under the controlling law, then, there is no material issue of issue of fact for trial regarding "aiding and abetting" of speech.

In sum, then, applying governing Third Circuit law, I find that there is no genuine issue of fact as to the crucial material issue: whether Heffernan engaged in protected speech or expressive activity. I also find that his aiding and abetting claim is unsupported by the facts or the law. I will grant summary judgment to Defendants, and deny it to Plaintiff, on the claim of retaliation for exercise of the First Amendment right to free speech.

14

### C. Freedom of Association Claim

#### 1. Is a freedom of association claim properly before the Court?

Heffernan also claims that Defendants retaliated against him because he exercised his First Amendment right to freedom of association. Judge Sheridan held a jury trial on that issue and entered judgment for Plaintiff. Later, after Judge Sheridan granted a new trial, Judge Cavanaugh entered summary judgment for Defendants, based solely on a finding that Heffernan did not engage in protected speech. Judge Cavanaugh's ruling did not, however, touch on the freedom-of-association issue. The Third Circuit, reversing and remanding, directed this district court to determine whether a freedom of association claim is properly before this Court.

The Complaint is of course the starting point. The Complaint asserts that "this action is brought pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the United States Constitution." (Complaint at ¶ 2 (Doc. No. 1)). Count I (the only count now pending) alleges that Defendants "deprived Heffernan of the privileges and immunities secured to him by the First and Fourteenth Amendments of the United States Constitution and, in particular, his right to hold employment without infringement of his First Amendment right to freedom of speech." (*Id.* at ¶ 40). The Complaint further alleges that Defendants "transferred Heffernan in order to deny Heffernan his First Amendment right to free speech." (*Id.* at ¶ 41). The Complaint does not allege or even suggest that Heffernan supported or affiliated himself with the Spagnola campaign. (*See id.* at ¶¶ 11-42). It does allege, however, that two of Heffernan's superiors in the police department, Papagni and Fraher, *told Heffernan* that he was being transferred "because of his political affiliation." (*Id.* at ¶ 28). That allegation, however indefinitely, at least suggests a freedom-of-association claim.

Heffernan's Trial Brief states that Defendants violated Plaintiff's right to freedom of association, but does not elaborate factually. (Trial Brief at II.B (ECF No. 41)). A motion *in limine* filed by Heffernan alludes to a freedom-of-association claim, but in a confusing manner. (ECF No. 39 at II.C). One subsection of the brief is titled "Freedom of Association," which seems clear enough. But that subsection is contained within a section headlined "Heffernan's *Speech* is Protected by the First Amendment." (*Id.* (emphasis added)). As in the Trial Brief, no factual basis is stated. From the case law cited, however, it might be inferred that Heffernan was asserting a freedom-of-association claim. (*Id.*).

The Final Pretrial Order invokes the First Amendment generally, but does not invoke freedom of association with specificity. The Order states that Heffernan's issues are, *inter alia*: "Whether Defendants...deprived Heffernan of the privileges and immunities secured to him by the First and Fourteenth

15

Amendments…in particular, his right to hold employment without infringement of his First Amendment right to freedom of speech"; and "Whether Heffernan was demoted and transferred in direct retaliation for his First Amendment Rights." (Final Pretrial Order (ECF 53-1) at p.43).

It was based on a broad reading of the Pretrial Order that Judge Sheridan permitted the freedom-of-association claim to go forward. He ruled that "[t]he final pretrial order set up the issue with regard to association and speech… [and] both parties knew the scope of the issue[s]." (Lockman Cert. Ex. BB at A271). At the outset of trial, Defendants expressed surprise at this. (*Id.* at A270). After trial, they appealed the judgment on the basis of Judge Sheridan's having allowed Heffernan "to proceed on a First Amendment freedom of association claim, when no such claim was pled in Plaintiff's Complaint or within the final pre-trial order." (ECF No. 83). Now, Defendants continue to argue that Heffernan did not properly raise a freedom of association claim. And they argue that they never received 'fair notice' of such a claim in the Complaint, as required by Fed. R. Civ. P. 8.

Examining the foregoing procedural history, I find some indications that Heffernan, when he referred generally to "the First Amendment," intended to include both freedom-of-speech and freedom-of-association theories. The Complaint at least refers to Heffernan's political affiliation as perceived by his superiors. And, as stated above, freedom of association was asserted, however briefly, in the Plaintiff's trial brief and pretrial motions in limine. True, Heffernan could and should have been far clearer. Before trial, Rule 15(a) would have permitted him to resolve all ambiguity by amending his Complaint. He did not. At or even after trial, Rule 15(b) would have permitted an amendment based on an objection, or to conform the complaint to issues that were tried by express or implied consent.[6] Again, Heffernan made no such motion.

---

[6]     (b) Amendments During and After Trial.

(1) *Based on an Objection at Trial.* If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

(2) *For Issues Tried by Consent.* When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

If the tortuous procedural history of this matter were a film, we could freeze the frame at one point or another and find, from that viewpoint, that Defendants seem to have a valid procedural point. I must, however, view the case from the perspective of today. This matter is once again at the "pretrial" stage, despite the Court's having once tried the case to judgment for Plaintiff, and once having entered summary judgment for Defendants. Now, after two reassignments, a retrial, and an appeal, this Court has again been asked to decide upon what issues the case should go forward.

From that forward-looking perspective, I will permit the assertion of a freedom-of-association theory, in addition to the freedom-of-speech theory. Such a liberal approach is in the spirit of Federal Rule of Civil Procedure 1, which discourages the forfeiture of issues based on technicalities of pleading, and Rule 15, which permits free amendment of pleadings before trial. I see no particular potential for prejudice to Defendants. Trial, if it were to occur, would occur some months in the future. The facts have been fully explored in discovery. These alternative legal theories are just that: different legal lenses through which to view the same fairly simple set of facts. This case was, after all, tried and won before Judge Sheridan on a freedom-of-association theory. At this point, Defendants have "unbelievably clear notice" that plaintiff intends to assert a freedom-of-association claim.[7] I will therefore permit that claim to proceed.

### 2.  The Merits of the Freedom-of-Association Claim

Two basic freedom-of-association rights, if exercised, can give rise to a retaliation claim. (*See* Dfd's Br. in Supp. of Mot. for Summ. J. at pp. 17-18 (ECF No. 189-1)). They are: 1) the right to associate with groups engaged in expressive activity or 2) the right to maintain a political affiliation. *See Ferraioli v. City of Hackensack Policy Dep't*, 2010 U.S. Dist. LEXIS 8527 at *22 (D.N.J. July 29, 2009). In this case, there is no meaningful distinction between the two. The only claimed "group" is the Spagnola political campaign, and the only "expressive activity" the furthering of Spagnola's political message. Thus the alleged retaliation can only have occurred in response to Heffernan's (a) having affiliated himself with the Spagnola political organization, or (b) having been

---

Fed. R. Civ. P. 15(b).

[7]  *See* Pltf's Br. Opp. Summ. J. at pp. 30-31. Plaintiffs are here quoting the wry observation of District Judge Jed S. Rakoff, who sat by designation on the Third Circuit panel that heard Heffernan's appeal from Judge Cavanaugh's summary judgment ruling.

perceived to have done so.[8] I consider first the "in-fact" claim, and then the "perception" claim.

### a. Actual political association

Heffernan never pled or otherwise asserted that he had any political affiliation with Spagnola *in fact*. The Complaint alleges only that Heffernan "had a close personal relationship with Spagnola." (ECF No. 1 at ¶ 15). It states that Heffernan's "mother supported Spagnola" (*id.* at ¶18), but that Heffernan himself "was not eligible to vote in the 2006 Paterson mayoral election" because he was not a resident. (*Id.* at ¶16). Finally, the Complaint alleges that when Heffernan was demoted, *his superiors said* it was "because of his political affiliation to Spagnola." (*Id.* at ¶28). That paragraph, however, does not allege that Heffernan did hold any particular political beliefs or that he *in fact* politically affiliated himself with Spagnola. It states at most that his superiors *believed* this, a claim I discuss separately below.[9]

Heffernan has never testified or otherwise asserted that he actually affiliated himself with Spagnola's political organization. He now cites Goow's trial testimony that Heffernan was a "supporter" of Spagnola. (Goow's Trial Testimony, Lockman Cert. Ex. BB at A405:23; Pltf's Br. Opp. Summ. J. at p. 40). Goow's testimony, however, equivocates—and Goow confirmed that, on the day in question, Heffernan was not involved in any political activity but was merely running an errand for his mother. (*See* Goow's Trial Testimony at A406).

Most importantly, *Heffernan himself* asserted that he had no political connection to Spagnola. Any "support" consisted of passive well-wishing based

---

[8] To put it another way, there is no doubt that the Spagnola campaign was a political organization, and that an affiliation with the campaign might constitute a political affiliation for purposes of a First Amendment freedom-of-association claim. *Ferraioli* illustrates the political/nonpolitical distinction. There, Judge Chesler made clear that although "political affiliation" is not "limited to affiliation with a political *party*" and includes causes, ideas, and candidates, such an affiliation must "implicate[] the furtherance of political views." *Id.* at *24 (citing *Aiellos v. Zisa*, 2009 U.S. Dist. LEXIS 97542 at *21 (D.N.J. Oct. 20, 2009) (Martini, D.J.)). In *Ferraioli*, although plaintiffs alleged retaliation for exercise of their "right to free speech and...right to vote," they were referring to a labor union election, not a political campaign. *Id.* at *16, *18. Thus their claim did not directly pertain to any *political* belief or cause. *Id.* at *24-26. Judge Chesler therefore rejected the plaintiffs' contention that they had pled "a political affiliation."

[9] Another paragraph alleges that Heffernan "was demoted in direct retaliation for his exercise of protected activities." (*Id.* at ¶31). This is most naturally read as referring to his free-speech claim. At any rate, it does not explicitly say anything about affiliation with a political party or campaign.

on friendship. Heffernan testified at trial that "I wasn't politically involved. I was just picking up a sign for my mom." (Heffernan's Trial Testimony at A499:25-A500:1). Heffernan reiterated: "I told [Papagni] I wasn't involved in the campaign." (*Id.* at A501:11). Nothing in the record suggests that, at the time he picked up the signs, Heffernan acted from political conviction or sought to associate himself with any political group or movement. He was admittedly friendly with Spagnola, but did nothing with the intent of furthering the goals of the campaign or promoting a message. He merely picked up the sign as an accommodation to his ailing mother, and he has never claimed otherwise.[10] *See* pp. 9-11, *supra* (citing the record).

In short, there is not a material issue of fact as to whether Heffernan in fact affiliated himself with the Spagnola political campaign. Heffernan himself denied it, and—the case having been tried to conclusion—there is an unusually well-developed record on the point. I therefore grant Defendants' motion for summary judgment as to this theory.

### b. Perceived political association

What Heffernan did repeatedly say (and others corroborated him) was that Defendants demoted him because they mistakenly believed that his actions betokened an affiliation with the Spagnola political organization. (*E.g.,* Heffernan's Trial Testimony, Lockman Cert. Ex. S at A201, 153:1-6; Pltf's Br. in Opp. at p. 45). In short, his superiors wrongly perceived that Heffernan had fetched the lawn sign as part of his work for the Spagnola campaign. Heffernan invokes cases from the Sixth, First and Tenth Circuits that have recognized a freedom-of-association claim where an employer demotes or fires an employee in retaliation for a political affiliation that is only perceived, not actual. Under the current law of this Circuit, however, adverse action based on such a mistaken belief does not constitute First Amendment retaliation, as a matter of law.

As established above, the law in this Circuit is clear, at least as to a First Amendment freedom-of-speech claim. No First Amendment claim arises from retaliation based on an employer's mistaken belief that the employee engaged

---

[10] Contrary to Heffernan's argument, then, this case is nothing like *Perez v. Cucci*, 725 F. Supp. 209, 238-239 (D.N.J. 1989). (Pltf's Br. Opp. Mot. for Summ. J. at pp. 45-46). In *Perez*, Judge Ackerman addressed a patronage system in the Jersey City Police Department, under which promotions and demotions were handed out in accordance with a police officer's personal political affiliations. There, the plaintiff "openly and actively supported the reelection bid of [the] then-Mayor[.] Specifically, the plaintiff attended numerous rallies and meetings. As president of the Hispanic Law Enforcement Society of Hudson County, the plaintiff's name and/or photograph appeared (1) in campaign literature and political advertisements...and (2) in paid political advertisements in the Jersey Journal..." 725 F. Supp. at 218. The Court found that, after a new mayor took over, the plaintiff suffered retaliation based on his political affiliations.

in protected speech. *Ambrose*, 303 F.3d at 496; *Fogarty*, 121 F.3d at 891; *Myers v. County of Somerset*, 515 F. Supp. 2d 492, 501 (D.N.J. 2007). That requirement of actual speech or actual expression leaves no room for a perceived-support claim. *See* pp. 12-13, *supra*.

It perhaps is an open issue whether the *Ambrose* holding extends to freedom of association, as well as freedom of speech. For these purposes, however, the distinction between a freedom-of-speech retaliation claim and a freedom-of-association retaliation claim does not seem significant. *Ambrose* articulated a general rationale—no First Amendment retaliation without First Amendment conduct—that would apply equally to both. Third Circuit case law articulates no principled basis for treating them differently. Absent such a statement, a proper respect for the letter and spirit of the *Ambrose* holding requires that I apply it in the closely related context of freedom of association. Unless the Third Circuit limits it or reconsiders it *en banc,* I am bound to follow the lead of *Ambrose.*

That said, the United States Court of Appeals for the Sixth Circuit has clearly endorsed a perceived-support theory as a basis for a freedom-of-association retaliation claim. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286 (6th Cir. 2012). The issue in *Dye* was "whether individuals claiming to have been retaliated against because of their political affiliation must show that they were actually affiliated with the political party or candidate at issue. We believe that they do not." *Id.* at 292. There, four stewards of the Michigan Racing Commission alleged that they had suffered retaliation because their superiors "attributed a political affiliation" to them. *Id.* at 309. There was evidence that the Commissioner, appointed by a Democratic governor, stripped the stewards of benefits because she assumed (wrongly, said the stewards) that they were affiliated with the Republican Party and the governor's Republican challenger. *Id.* at 300-302. The Sixth Circuit held that "[a]n employer that acts on such assumptions regarding the affiliation of her employees should not escape liability because her assumptions happened to be faulty." *Id.* at 302. The Court of Appeals reversed the district court's award of summary judgment to the defendants, because "retaliation based on perceived political affiliation is actionable." *Id.* at 299-300.

If *Dye* had distinguished *Ambrose* and drawn a principled distinction between freedom of speech and freedom of association for these purposes, I could perhaps consider it as persuasive authority. But it did not. *Dye* rejected the *Ambrose* principle categorically and explicitly disapproved the reasoning of the Third Circuit.[11] To state the obvious, *Dye's* rationale—that the Third Circuit

---

[11] In particular, the Sixth Circuit stated that *Ambrose* had misapplied or overextended the Supreme Court's holding in *Waters v. Churchill, supra*. According to the Sixth Circuit, *Waters* was talking about due process standards, not a First Amendment retaliation claim. 702 F.3d at 300 (citing *Waters,* 511 U.S. at 679; *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1189 n.9 (6th Cir. 1995) (interpreting

was wrong—is not one that is available to me, a district judge sitting within the Third Circuit.

More briefly, I will examine a First Circuit case and a Tenth Circuit case upon which *Dye* relied. *Dye* treated them as strong authority for the perceived-support rationale. I am less certain.

The United States Court of Appeals for the First Circuit dropped a tantalizing hint in *Welch v. Ciampa*, 542 F.3d 927, 938-39 (1st Cir. 2008), but ultimately *Welch* provides no basis for me to distinguish *Ambrose*. The *Welch* plaintiff, a police officer, remained silent during a recall election in which his bosses took a keen interest. The First Circuit found, without extended discussion, that there had been no speech, and therefore rejected a free-speech retaliation claim. *Welch* does not cite *Ambrose*, but this holding, as to freedom of speech, is consistent with *Ambrose*.

In the alternative, the *Welch* plaintiff asserted a freedom-of-association claim. That is, the plaintiff alleged that the defendants retaliated against him because he remained neutral and refused to "participate in any campaign activities" in the recall election. *Id.* at 934 ("Welch decided not to participate in any campaign activities related to the recall. His decision to remain neutral was regarded as a betrayal...."). The First Circuit upheld that freedom-of-association claim. I do not think, however, that *Welch* can be read to fully support the *Dye* holding. Nor does it help establish that the reasoning of *Ambrose* should be confined to freedom-of-speech claims.

To my way of thinking, the holding of *Welch* does not rest on the notion that plaintiff's neutral stance gave rise to a mistaken perception that he belonged to a hostile faction. Rather, *Welch*'s holding is grounded in the well-established proposition that, under the freedom-of-association clause, *refusal to participate in a political campaign is itself protected conduct*: "The freedom not to support a candidate or cause is integral to the freedom of association and freedom of political expression that are protected by the First Amendment." *Id.* at 939 (citing, *e.g., Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76 (1990)). Indeed, that view of the freedom-of-association clause is in accord with Third Circuit law. *See Galli v. N.J. Meadowlands Comm'n,* 490 F.3d 265, 272 (3d Cir. 2007) ("[T]he right not to have allegiance to the official or party in power itself is protected under the First Amendment, irrespective of whether an employee is actively affiliated with an opposing candidate or party.").

---

*Waters*)). *Dye* also noted that *Ambrose* and other cases had rejected the perceived-support rationale in the context of free speech, not freedom of association. *Dye* did not suggest any basis for disparate treatment of the two issues, but stated that it did not need to reach the free speech issue. 702 F.3d at 299 n.5.

Heffernan has never claimed, however, that he was punished for remaining neutral or for refusing to campaign for a candidate favored by his superiors. He has maintained throughout that he was punished because his superiors incorrectly thought he was campaigning for Spagnola, activity that would have been inappropriate for a public employee. Thus to deny his claim would not be inconsistent with the holding of *Welch* as I understand it.

*Welch* did not, in so many words, discuss or analyze a perceived-support theory. *Dye* did, however, quote some language from *Welch* that could be read to support such a theory. I think this may have pushed *Welch* too far. Based on the principle that freedom of association encompasses the right not to be punished for declining to join a political campaign or movement, the *Welch* court stated that "active support for a campaign or cause may help the plaintiff meet her evidentiary burden of showing that the adverse employment decision was substantially motivated by her political affiliation.... But neither active campaigning for a competing party nor vocal opposition to the defendant's political persuasion are required." 542 F.3d at 939. So far, so good; the freedom-of-association clause protects the right to refrain from a particular association. *Welch* then stated that "[w]hether Welch actually affiliated himself with the anti-recall camp [was] not dispositive *since the pro-recall camp attributed to him that affiliation.*" *Id.* (emphasis added). I would not lightly infer a perceived-support theory from this stray reference. I find it more appropriate to treat this as dictum, for two reasons. First, the point is overdetermined. A plaintiff's failure to actually affiliate with a political movement or campaign is not dispositive, irrespective of any employer's perception, because the First Amendment protects such non-affiliation. Second, it appears that the Court was speaking in the context of proving defendant's *motivation*: specifically, that the alleged retaliation "was substantially motivated," *id.*, by plaintiff's exercise of First Amendment rights. The discussions of the First Amendment's coverage and the required intent may simply have overlapped.

The United States Court of Appeals for the Tenth Circuit considered a variant scenario in *Gann v. Cline*, 519 F.3d 1090 (10th Cir. 2008). There, adverse action was taken against an employee who allegedly failed to maintain the favored political affiliation. Focusing on the employer's motivations, rather than the employee's true beliefs, the court held: "[T]he only relevant consideration is the impetus for the elected official's employment decision vis-à-vis the plaintiff, i.e., whether the elected official prefers to hire those who support or affiliate with him and terminate those who do not." *Id.* at 1094. Here, too, the court grounded its analysis in Supreme Court authority for the proposition that "Discrimination based on political non-affiliation is just as actionable as discrimination based on political affiliation." *Id.* at 1093 (citing *Rutan*, 497 U.S. at 64; *Branti v. Finkel*, 445 U.S. 507, 517 (1980); *Elrod v. Burns*, 427 U.S. 347, 350 (1976)). Although relied on by *Dye*, *Gann* did not in fact articulate a perceived support theory.

22

There is a certain logic to *Dye*. Assume that State Employer A retaliates because Employee is a Democrat, or a Republican. Obviously there is a First Amendment freedom-of-association claim to be made. If State Employer B does the same thing, with the same unconstitutional retaliatory motive, *and is wrong to boot*, should it really be placed in a *more* favorable position?[12] Might the Third Circuit approach permit employers to intimidate employees into avoiding anything that might even be *mis*construed as political speech or affiliation? The *Dye* approach seems designed to afford the First Amendment some breathing space. It must be remembered, however, (a) that a First Amendment retaliation claim is not a comprehensive remedy for all employment-related unfairness; and (b) that the context is public employment, where the freedom to engage in political speech and partisan activity can permissibly be curbed.

Nothing about this out-of-Circuit case law persuades me that I am free to depart from *Ambrose* in the freedom-of-association context. The language and logic of *Ambrose* or *Fogarty* do not suggest that the Third Circuit would adopt a different rule for freedom-of-association cases. Accordingly, the letter and spirit of the *Ambrose* holding compel me to reject a perceived-support theory here. Heffernan's alternative theory that Defendants were motivated by a mistaken perception that Heffernan had politically affiliated himself with the Spagnola campaign is barred by the *Ambrose* principle that a First Amendment retaliation claim must be premised on an actual exercise of First Amendment rights. As a matter of law, Heffernan's perceived-support allegations do not give rise to a claim of First Amendment retaliation.

Construing the entire record in the light most favorable to Heffernan, I find that there is no genuine issue of material fact as to Heffernan's freedom of association claim, and that defendants are entitled to judgment as a matter of law. *See generally* Fed. R. Civ. P. 56(c). Defendants' motion for summary judgment is therefore granted as to Heffernan's freedom-of-association claim.

### D. Summary Judgment Motions of the City and Mayor Torres

Defendants have asserted additional grounds for summary judgment specific to the City of Paterson and Mayor Torres. These, however, are moot in light of my disposition of the other issues.

---

[12] And if the employer must be correct about the employee's political affiliation, how accurate must its perception be? Thus, for example, an employer might accurately perceive that an employee is a Democrat or a Republican, but inaccurately assume that the employee holds certain other beliefs as a result. It may be harder than it appears to get away from the employer's perceptions as a basis for determining whether an employee is in fact affiliated with "the enemy." Political prejudices can be irrational, but no less harmful for that.

The City of Paterson notes that it cannot be held liable under Section 1983 by virtue of *respondeat superior*. Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a plaintiff who wishes to hold a municipality liable must demonstrate that the constitutional violation occurred pursuant to an official municipal policy or custom. *Id.; Bielevicz v. Dubinon*, 915 F.2d 845, 849-50 (3d Cir. 1990). (Dfd's Br. Supp. Mot. Summ. J. at 52-56).

Mayor Torres denies that he engaged in any conduct which could make him liable under Section 1983. Chief Wittig, he says, was the sole decisionmaker, there is no evidence to back up Heffernan's allegation that Torres instructed Wittig to demote or transfer him. (Dfd's Br. Supp. Mot. Summ. J. at 56-58)

Plaintiff responds that his allegations against Chief Wittig and Mayor Torres establish a municipal policy, and that his evidence is sufficient to create an issue as to Torre's personal involvement. (Pltf's Br. Opp. Dfd's Mot. Summ. J. at 52-61). *See also Johnson v. Zagori*, 2011 U.S. Dist. LEXIS 71267, 7-8 (D.N.J. June 30, 2011) (citing *McKenna v. City of Philadelphia*, 582 F.3d 447, 460 (3d Cir. 2009); *Argueta v. United States Immigration & Customs Enforcement*, 643 F.3d 60 (3d Cir. 2011)).

Because I have found no underlying First Amendment violation, I need not reach the issue of whether Torres and the City would share liability for it. As to these issues, the Defendants' summary judgment motions are dismissed as moot.

## CONCLUSION

For the reasons stated above, the motion for summary judgment of Police Chief James Wittig is **GRANTED**; the motions for summary judgment of Mayor Jose Torres and City of Paterson are **GRANTED IN PART and DENIED IN PART AS MOOT**. Heffernan's Motion for Partial Summary Judgment is **DENIED**. The complaint will be **DISMISSED** in its entirety. An appropriate order will follow.

HON. KEVIN MCNULTY
United States District Judge

Dated: March 5, 2014
Newark, New Jersey

24